IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARGARET A. G.,[1] | ) |
|         Plaintiff, | ) |
| v. | ) Case No. 20-cv-259-RJD[2] |
| COMMISSIONER of SOCIAL SECURITY, | ) |
|         Defendant. | ) |

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423. Plaintiff filed a Motion for Summary Judgment (Doc. 20). Plaintiff's motion is DENIED and the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is AFFIRMED.

## Procedural History

Plaintiff applied for DIB and SSI on August 26, 2009, alleging she became disabled on January 1, 2007 (Tr. 263). After the evidentiary hearing in July 2011, ALJ Ayrie Moore denied her application on August 23, 2011. (Tr. 112-131). The Appeals Council remanded the case.

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Pursuant to 28 U.S.C. §636(c), this case was assigned to the undersigned for final disposition upon consent of the parties (Doc. 8).

(Tr. 32-135).   ALJ James Craig held a remand hearing in May 2013 and denied the application on June 19, 2013 (Tr. 14-33).   The Appeals Council denied Plaintiff's second request for review and Plaintiff filed a Complaint in this Court (Tr. 1-3).   On January 8, 2016, this Court reversed and remanded the matter to Defendant for rehearing and reconsideration of the evidence (Tr. 1070-1089).

On remand, Plaintiff amended her claim to allege a closed period of disability from January 1, 2007 through December 9, 2014 (Tr. 1295).   Following a hearing on August 25, 2016, ALJ Michael Scurry issued an unfavorable decision on October 18, 2016 (Tr. 918-945).   Plaintiff filed a Complaint in this Court, and the Court remanded the matter pursuant to a joint motion filed by the parties (Tr. 1989-1990).

After a hearing on remand, ALJ Scurry issued an unfavorable decision on February 9, 2018 (Tr. 1890-1941).   Plaintiff filed a Complaint in this Court, and the Court again remanded the matter pursuant to a joint motion by the parties (Tr. 2342-2344).

ALJ Jason R. Yoder held the fifth hearing on this claim on November 5, 2019 and issued an unfavorable decision on December 12, 2019 (Tr. 2191-2243).   Plaintiff did not submit written exceptions and the Appeals Council did not review the ALJ's decision.   Plaintiff timely filed this case on March 9, 2020 (Doc. 1).

### Issues Raised by Plaintiff

Plaintiff makes the following arguments:

1. The ALJ erred in evaluating Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms.

2. The ALJ erred in evaluating the opinion evidence.

3. The ALJ erred in making the residual functional capacity ("RFC") determination.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Importantly, this Court's scope of review is limited. "The findings of the Commissioner

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). This Court determines whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

In his 39-page opinion, the ALJ followed the five-step analytical framework described above. He determined that Plaintiff did not work at the level of substantial gainful activity from January 1, 2007 through December 9, 2014, the alleged closed period of disability.

The ALJ found that Plaintiff has severe impairments of "degenerative joint disease, polyarthritis, spinal enthesopathy hypothyroidism, plantar fasciitis, obesity, fibromyalgia, left ear moderate sensorineural hearing loss, major depressive disorder ("MDD"), dysthymic disorder, bipolar II disorder, generalized anxiety disorder, and post-traumatic stress disorder ("PTSD")." (Tr. 2197). However, he found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."

The ALJ found that Plaintiff has the residual functional capacity to:

> Perform light work…except she can lift and carry 20 pounds occasionally and 10 pounds frequently.  She can sit for at least six out of eight hours, and she can stand and/or walk for about six out of eight hours.  She can never climb ladders, ropes, or scaffolds. She can occasionally crawl or crouch.  She can frequently climb ramps and stairs, balance, stoop, and kneel.  She can frequently hear out of her left ear. She must avoid concentrated exposure to extreme cold. She must avoid even moderate exposure to loud noise, vibration, and dangerous workplace hazards such as exposed moving machinery and unprotected heights. She must work in an environment with a moderate noise intensity level or quieter as defined within the Selected Characteristics of Occupations (SCO), examples of which include light traffic, a grocery store, or a department store.  The individual can understand and remember simple instructions, and carry out simple, routine, and rote tasks that require little independent judgment or decision-making without stringent speed or strict rate-based production requirements.  She can perform no fast-paced assembly line type of work.  Her work must involve few, if any, daily changes in a work task or work environment, so she must have a relatively stable day-to-day work setting.  She can have occasional interaction with co-workers and supervisors, but only incidental public interaction, if any.

(Tr. 79).

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff is unable to perform past relevant work yet concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

## The Evidentiary Record

The Court reviewed and considered the entire evidentiary record in formulating this Order. The following summary of the record is tailored to Plaintiff's arguments.

### 1.    Agency Forms

Plaintiff was born in 1978 and was 28 years old on January 1, 2007.  (Tr. 263).  She was five feet five inches tall and weighed 189 pounds.  (Tr. 312).  She was insured for DIB through June 30, 2009.[4]

Plaintiff completed a function report in November 2009 in which she represented that on a

---

[4] The date last insured is relevant to the claim for DIB but not SSI. 42 U.S.C. §§423(c) and 1382(a).

daily basis, she took her son to and from school, performed household chores if she "felt like it," prepared her own meals, and bathed herself (Tr. 305). She reported that she forgot "things quickly," became "side-tracked easy," and "had to ask questions about certain things" (Tr. 310). She could not pay attention for "very long" but she followed written instructions "pretty good" and spoken instructions "ok sometimes." She stayed to herself "more now than I used to" (*Id*.). She needed reminders to take her medicine and do housework (Tr. 307). She encountered difficulty balancing her checkbook and counting money, but her condition had not changed her ability to manage money (Tr. 308, 309). Once a month she went grocery shopping (Tr. 308). She did not handle stress well (Tr. 311).

Plaintiff completed another function report in August 2014 (Tr. 1309). She continued to need reminders to clean her house (Tr. 1311). She fixed meals for her son (Tr. 1309). She went grocery shopping twice a month and managed her own bank account and paid her bills (Tr. 1312). She reported that counting change continued to be difficult for her, as she had throughout her life. She left her home twice a week in a car. She needed a timer or alarm on her cell phone to remind her to take her medications (Tr. 1311). She could not handle stress "at all." Every Wednesday she went to a group counseling session and once a month she went to a counseling appointment. She did not take a bath or shower "all [the] time" and she did not always wear clean clothes (Tr. 1310).

    2.    **Evidentiary Hearings**

Plaintiff was represented by counsel at all five evidentiary hearings in this matter. The first evidentiary hearing was held on July 6, 2011 (Tr. 72). Plaintiff testified that she lived with her husband and 10-year-old son (Tr. 73). A high school graduate, Plaintiff can read, write and

drive (Tr. 74). From December 2007-October 2009, she took care of a child with disabilities (Tr. 75-76). She testified that she had bipolar disorder, which caused her to have 1-3 bad days a week where she did not want to get out of bed, get dressed, brush her teeth, or leave the house (Tr. 77). She did some grocery shopping, but in more than 50% of her trips to the grocery store she had difficulty concentrating and forgot things she needed at home (Tr. 83). She attributed her decreased concentration to being around other people at the store (*Id*.).

On May 22, 2013, Plaintiff testified at the second evidentiary hearing. Her husband worked outside the home in an oil field and her son was developmentally disabled (Tr. 38, 51). In 2008 and 2009, Plaintiff baby-sat 20 hours a week for a friend's disabled son (Tr. 39). The job ended because she was often late or did not show up (Tr. 39, 42). She lost previous jobs for similar reasons. She took certified nursing assistant (CNA) classes twice but never passed the final exam. (Tr. 42).

Similar to the first hearing, Plaintiff testified that 1-3 days a week, her depression kept her from leaving her home (Tr. 43). On those days, she stayed in bed with the curtains drawn (Id.). She did not brush her teeth, bathe, or interact with her family (Tr. 43). She might start to do laundry, but "not get it all done" (Tr. 44).

Plaintiff testified that she took her medications for bipolar disorder, anxiety, and sleep as prescribed by her psychiatrist (Tr. 40, 48). She had received mental health treatment for 4-5 years. Her psychiatrist frequently changed her medications to alleviate side effects or increase effectiveness (Tr. 49). She also lost some hearing in her left ear due to nerve damage but did not have a hearing aid (Tr. 41).

A vocational expert ("VE") also testified. The ALJ asked the VE to assume the following

hypothetical in which an individual: 1) had Plaintiff's education and vocational background; 2) could not be in an environment that was more than moderately noisy; 3) could not receive detailed or complex instructions; 4) could not have contact with the public to complete the job process; 5) could only have occasional intermittent contact with co-workers and supervisors; 6) performed work in three steps or less with no fast pace or strict quotas; 7) performed work that was thing oriented, instead of working with people or data (Tr. 55-57).  The VE testified that this person would be unable to perform Plaintiff's previous work, but a significant number of jobs existed in the local and national economy at the light and sedentary exertional levels (Tr. 56-57).  However, the VE also testified that if the person worked less than six hours a day on three or more days of work per month, he would not be able to do those jobs or any job (Tr. 58).

At the third hearing (held on August 25, 2016), Plaintiff testified that she had re-entered the work force and was employed by a janitorial service cleaning company, cleaning residential and commercial properties (Tr. 2067).  At the fourth hearing (held on January 22, 2018), Plaintiff testified briefly to explain that there were periods of time in which she had not taken her medications as prescribed, but only because she could not afford them (Tr. 1948).

At the fifth hearing (held on November 19, 2019), Plaintiff testified that she stood by her previous testimonies regarding her ability to do housework  She further testified that when she was in primary and secondary school, she received resource help from the special education teachers (Tr. 2264).  Math was difficult for her, and she continues to need to use a calculator for anything other than simple addition or subtraction (Tr. 2265).

Plaintiff explained that during the January 2007-December 2014 period, her medications were frequently adjusted (Tr. 2268).  Once adjustments were no longer necessary because

Plaintiff's medications effectively addressed her symptoms, she re-joined the work force in December 2014 (Tr. 2268, 2269).

### 3.     Relevant Medical Records

Plaintiff started counseling at Community Resource Center ("CRC") in 2006. She had previously received counseling at CRC and presented in 2006 because she needed support as she prepared to leave her abusive husband (Tr. 477). She was "somewhat depressed" over the situation with her husband (*Id.*).

Plaintiff started seeing Advanced Practice Nurse ("APN") Janet Merrell on January 29, 2007 (Tr. 394). APN Merrell noted that Plaintiff's cognition, insight, and judgment were good (Tr. 395). She had average intelligence. Her attention and concentration were poor. Her thought processes were organized but she worried constantly. Plaintiff explained that her husband was abusive and controlling. She had tried to separate from him in the past, but he stalked her (Tr. 394). APN Merrell's initial impression was major depressive disorder and post-traumatic stress disorder. She prescribed Paxil (Tr. 395). Over the next seven and a half years, APN Merrell prescribed a variety of medications to Plaintiff, including Lamictal, Celexa, Zoloft, Wellbutrin, Clonazepam, Buspar, and Trazodone (Tr. 412, 1583). Plaintiff continued with counseling during that time period.

Plaintiff saw APN Merrell five times in 2012. Plaintiff reported that she felt anxiety because of her son's aggressive behaviors related to his autism (Tr 1557, 1559, 1561). In December 2012, Plaintiff was taking the following psychotropic medications: Lamictal (200 milligrams at night) and Celexa (20 milligrams every day) (Tr. 1561).

Plaintiff saw APN Merrell six times in 2013 (1565-1575). Plaintiff reported that she

continued to feel anxiety regarding her son and believed that he had bipolar disorder. After a court hearing, she was able to start seeing her daughter more frequently. Her husband threatened to leave her. (*Id*.). In December 2013, Plaintiff took the following psychotropic medications: Lamictal (200 milligrams at night), Celexa (30 milligrams daily), Buspar (10 milligrams twice daily), Trazodone (100 milligrams at night).

On February 24, 2014, Plaintiff saw APN Merrell, who did not change her medications (Tr. 1577). In May 2014, Plaintiff returned to see APN Merrell and reported that she was frustrated because she and her son lost their medical cards (Tr. 1579). She had increased anxiety. She was taking care of a little girl who had some behavior problems (*Id*.). APN Merrell increased Plaintiff's Buspar prescription to 15 milligrams three times daily (*Id*.). Plaintiff saw APN Merrell on August 11, 2014, and reported that her husband had left her and she had been out of medicine for one month. To restart Plaintiff on her medicine, APN Merrell prescribed Celexa (20 milligrams daily), Buspar (15 milligrams ½ tablet for one week and then increase to 15 milligrams twice daily), Trazodone (50 milligrams at night, then increase to 100 milligrams at night), and Lamictal (25 milligrams at night for two weeks then increase to 50 milligrams at night) (Tr. 1582).

On September 15, 2014 (three months before Plaintiff rejoined the work force), APN Merrell noted that Plaintiff was "upset about her husband leaving her" (Tr. 1583-1584). Plaintiff was taking the following psychotropic medications: 1) Lamictal, 50 milligrams at night; 2) Celexa, 20 milligrams daily; 3) Buspar, 15 milligrams twice daily; 4) Trazodone, 100 milligrams at night. APN Merrell increased Plaintiff's Lamictal prescription to 200 milligrams at night, her Celexa prescription to 30 milligrams daily, and her Buspar prescription to 15 milligrams three times daily (Tr. 1584).

Plaintiff saw APN Merrell in August 2016 (Tr. 1886). At that time, she was still taking Lamictal, Celexa, Buspar, and Trazodone. Her dosages were the same as they had been in November 2014, except she was taking 40 milligrams a day of Celexa instead of 30 milligrams. APN Merrell recommended that she continue taking medicine and participating in counseling (Tr. 1886).

### 4. Disability Application

APN Merrell and Dr. Judy Keeven (psychiatrist) completed Plaintiff's "Application for Illinois Disabled Person Identification Card." They represented that Plaintiff had a "Class 2" mental disability, which the application defined as:

> [A]ny type of disability which renders a person unable to engage in any substantially gainful activity, or which substantially impairs the person's ability to live independently without supervision or in-home support services, or which substantially impairs the person's ability to perform labor or services for which he/she is qualified or significantly restricts the labor or services for which he/she is able to perform.

The form did not provide the doctor or APN Merrell an opportunity to explains their reasoning (Tr. 875-76).

### 5. Treating Counselors' Opinions

In late 2010, APN Merrell and one of Plaintiff's counselors completed a Mental Functional Capacity Report (Tr. 623). Plaintiff's impairment/diagnosis was Bipolar II disorder and Generalized Anxiety disorder. They noted that she had marked limitations in the areas of activities of daily living and social functioning. They further noted that she had extreme limitations in the areas of concentration, persistence, and pace (*Id.*). The counselor and APN Merrell anticipated that more than three times a month, Plaintiff would be absent from work because of her impairments or treatments (Tr. 624). A therapist and APN Merrell completed the

same evaluation in 2013 and indicated that Plaintiff had marked limitations in activities of daily living and concentration, persistence, and pace. They noted that she had extreme limitations in social functioning. They anticipated that, similar to the 2010 report, Plaintiff would have to miss work 3 times a month because of her treatments or impairments (Tr. 899-901). The counselor wrote that Plaintiff "had several episodes of decompensation in the past 12 months" (Tr. 901).

The therapists at the Community Resource Center evaluated Plaintiff's functional impairments approximately 1-3 times a year. In 2009, the therapist noted on three occasions that at most, Plaintiff's limitations were moderate.[5] The therapists made the same findings on two occasions in 2010, two occasions in 2011, and once in May 2012 (Tr. 1417-1420, 1423, 1424, 1435-1437, 1444-1445, 1472, 1485-1486, 149-1494).

### 6. Consultative Examination

Plaintiff underwent a psychological consultative examination with state agency psychologist Fred Klug in January 2010 (Tr. 473). Her attention span was adequate and her concentration was fair (Tr. 474). Her immediate memory varied and her short-term memory was intact with coding deficits. Her long-term memory was intact. Her expressive language was good and receptive language appeared unimpaired. Her abstract thinking, reasoning, judgment, insight, and ability to perform simple calculations were poor (Tr. 474, 475). Her fund of knowledge was very restricted and not commensurate with her education (Tr. 476). Overall, her intellectual functioning appeared borderline (Tr. 475).

Her thought processes were goal-directed and relevant (Tr. 476). She experienced compulsions focused on "cleanliness, neatness, and everything being in its place." She worried

---

[5] The therapist noted that she showed minimal engagement in 2009 (Tr. 1486-1494).

about bills and family. She experienced mood swings that would last an hour in which she would shift from feeling happy to screaming and yelling. She reported feeling depressed nearly every day for the last two years. Her affect was constricted and consistent with her thought content. Her predominant mood was dysphoric. Dr. Klug's diagnostic impressions of Plaintiff were dysthymic disorder-late onset and generalized anxiety disorder. He found her competent to manage her own funds (*Id*.).

### 7. Mental RFC assessments

Dr. Jerrold Heinrich (state agency psychologist) reviewed Plaintiff's records in 2010. He determined she was moderately limited in her ability to 1) carry out detailed instructions; 2) maintain concentration/attention for extended periods; 3) respond appropriately to changes in the work setting. He did not find that any of her abilities were markedly limited (Tr. 445-446).

Dr. Michael Cremerius (state agency psychologist) reviewed Plaintiff's records on November 22, 2014. He found that Plaintiff's mental impairments mildly restricted her activities of daily living, moderately affected her ability to maintain social functioning, and moderately affected her ability to maintain concentration, persistence, or pace (Tr. 1102). He determined that she had no repeated episodes of decompensation. Another state agency psychologist (Philip Brister) made identical findings in May 2015 (Tr. 1120).

### Analysis

Plaintiff contends that the ALJ erred when he evaluated Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her "bad days", and that the ALJ cherry-picked and mischaracterized the evidence regarding Plaintiff's subjective complaints. To evaluate the claimant's subjective complaints, the ALJ determines "whether there is an underlying medically

determinable physical or mental impairment(s) that could reasonably be expected to produce" the claimant's symptoms.  Social Security Ruling (SSR) 16-3p, 2017 WL518034, at *3 (Oct. 25, 2017).   If so, then the ALJ considers objective medical evidence and "any other relevant evidence in the individual's case record" to determine whether the claimant's "ability to perform work-related activities" is limited by the intensity and persistence of the symptoms. *Id*. at *2; 20 C.F.R. §404.1529.

To support her argument that ALJ Yoder erred when he evaluated Plaintiff's testimony pertaining to the intensity, persistence, and limiting effects of her "bad days," Plaintiff mostly re-states findings and conclusions reached by this Court and the Appeals Council on decisions by the prior administrative law judges in this matter.  ALJ Yoder's decision reflects that he considered the objective medical evidence and any other relevant evidence in Plaintiff's case record.  ALJ Yoder reviewed and considered the notes and assessments made by APN Merrell and the therapists at Community Resource Center.  In 2010 and 2013, APN Merrell and the therapists completed Mental Functional Capacity Reports that noted Plaintiff had marked and extreme limitations, and that Plaintiff would have to miss work three times a month because of her conditions and treatment.  However, these findings were not consistent with the therapists' evaluations that were made as they treated Plaintiff, and the ALJ Yoder explained that because of those inconsistencies, he did not give weight to the 2010 and 2013 mental functional capacity reports.

ALJ Yoder further considered the findings of multiple state agency psychologists, including Dr. Fred Klug, who performed a consultative psychological evaluation.  ALJ Yoder noted that Dr. Klug made multiple abnormal findings, yet still concluded that Plaintiff could manage her own funds.

Regarding "any other relevant evidence" in the case record, Plaintiff faults the ALJ for noting multiple times that Plaintiff "cared for two disabled children alone." The record reflects that while Plaintiff's son lived with her, Plaintiff's daughter mostly lived with Plaintiff's mother, who retained custody (Tr. 430). Moreover, Plaintiff had difficulties taking care of her daughter during the times she stayed with Plaintiff (Tr. 425-440, 1456). To the extent that the ALJ erred when he noted that Plaintiff "cared for two disabled children alone," this error does not require remand. Certainly, there are references in the records where Plaintiff refers to having her two children in her home (*See, e.g.*, Tr. 274, 1450, 1456). Moreover, in 2008-2009 Plaintiff cared for another child with disabilities, and another child with behavior problems in 2014.

Plaintiff also claims that the ALJ nefariously "felt compelled to misstate [Plaintiff's] testimony that she had testified her bad days occurred three days a week, (sic) in fact and as cited by the Court, she testified they occurred one to three days a week." However, it appears that ALJ Yoder was simply addressing the Appeals Council's finding that the prior ALJ failed to "mention that [Plaintiff] had three bad days a week" (Tr. 2349). In light of Plaintiff's argument that ALJ Yoder did not follow directives from the Appeals Council, it is ironic that Plaintiff criticizes ALJ Yoder for addressing the Appeals Council's finding (Tr. 2349).

Plaintiff further argues that the ALJ made a "profoundly incorrect" error when he referred to Plaintiff's testimony regarding the 1-3 bad days a week as a "subjective assessment" instead of a subjective complaint. This error appears unintentional. Throughout the rest of the report, ALJ Yoder refers to Plaintiff's "subjective complaints" (Tr. 2208, 2223, 2225)

Plaintiff contends that the ALJ's summaries omit references to significant function deficits. However, those deficits (listed on Doc. 20-1, p. 25) are sufficiently addressed on pages 12-13 of

the ALJ's decision (Tr. 2205, 2206). Plaintiff then claims that the ALJ's report omits "significant medicine changes, objective mental status findings, and [Plaintiff's] symptoms." The ALJ did not cite every single visit or medicine change, but his decision is replete with Plaintiff's subjective complaints and discusses the frequency with which Plaintiff's medication was changed (Tr. 2209, 2210). Importantly, the ALJ noted that when Plaintiff rejoined the work force in December 2014, she was taking the same psychotropic medications that she had been taking through most of 2014 (minus a one month period when she could not afford her medication). Except for Buspar (which she was taking at 10 milligrams twice daily in December 2013, compared to 15 milligrams twice daily in December 2014), the dosages were all the same. This point contradicts the argument Plaintiff advanced at her 2019 hearing: that Plaintiff was able to go back to work once APN Merrell found the right prescription combination for her. Accordingly, Plaintiff's argument that ALJ Yoder erred when he evaluated Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her "bad days" is simply an invitation to the Court to re-weigh the evidence.

Plaintiff asks the Court to find that ALJ Yoder erred in the course of making the RFC determination for all of the reasons that she sets forth in support of her argument that ALJ Yoder erred when he evaluated the intensity, persistence, and limiting effects of her "bad days." As explained above, the Court does not find that the ALJ erred in determining the intensity, persistence, and limiting effects of Plaintiff's "bad days." An ALJ adequately supports his RFC determination when he "consider[s] all limitations supported by [the] record evidence" and "tie[s] the record evidence to the limitations included in the RFC finding." *Jozefyk v. Berryhill*, 923 F.3d 492, 497–98 (7th Cir. 2019). ALJ Yoder adequately supported the RFC determination in this case.

Next, Plaintiff argues that ALJ Yoder erred in his evaluation of the opinion evidence. Specifically, Plaintiff claims that ALJ Yoder should have afforded the greatest weight to the opinions of APN Merrell and the counselors at Community Resource Center. ALJ Yoder explained why he attached less significance to their opinions-he found that their assessments as they treated Plaintiff contradicted the determinations they made on Plaintiff's Mental RFC Evaluations in 2010 and 2013. It is appropriate for the ALJ to consider a medical provider's consistency when evaluating his/her opinions. 20 C.F.R. § 404.1527(c)(4).

Plaintiff also criticizes the weight ALJ Yoder assigned to opinions by the state agency psychologists (specifically, Brister and Cremerius). ALJ Yoder explained that he assigned weight to their opinions based on their specialties, their familiarity with the department's disability programs, and their longitudinal review of Plaintiff's records from 2006-2014. These factors were appropriately considered. 20 C.F.R. § 404.1527(c)(6). The Court will not substitute its judgment for that of the ALJ.

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: March 31, 2021**

*s/* *Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**